REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 418

SEPTEMBER TERM, 2015

STANLEY ROCHKIND

v.

STARLENA STEVENSON

Eyler, Deborah S.,
Nazarian,
Wilner, Alan M.
        (Retired, Specially Assigned)

JJ.

Opinion by Eyler, Deborah S., J.

Filed: September 1, 2016

Kevin F. Arthur, J., did not participate in the Court's decision to report this opinion pursuant to Md. Rule 8-605.1.

In the Circuit Court for Baltimore City, Starlena Stevenson sued S&S Partnership ("S&S"), Stanley Rochkind, and Dear Management & Construction Company ("Dear") for negligence and violations of the Consumer Protection Act ("CPA"), Md. Code (1975, 2013 Repl. Vol.), section 13-301 *et seq.* of the Commercial Law Article ("CL").[1] As relevant here, she alleged that she suffered injuries as a result of ingesting lead-based paint inside 3823 Fairview Avenue ("the Fairview Property"), which was owned by Mr. Rochkind and S&S and was managed by Dear.

In March of 2014, the case was tried to a jury with Judge Steven Sfekas presiding ("the First Trial"). The jury returned a verdict in favor of Ms. Stevenson, awarding her $829,000 in economic damages and $534,000 in non-economic damages. Mr. Rochkind moved for a new trial or, in the alternative, a remittitur. Judge Sfekas granted the motion in part, ordering a partial new trial on damages.

The partial new trial was held before a jury in October and November of 2014, with Judge Pamela White presiding ("the Second Trial"). The jury returned a verdict awarding Ms. Stevenson $753,000 in economic damages and $700,000 in non-economic damages. Mr. Rochkind filed a motion for new trial, which was denied, and Ms. Stevenson filed a motion for attorneys' fees, which also was denied. Applying the cap on non-economic damages, *see* Md. Code (1973, 2013 Repl. Vol.), section 11-108 of the

---

[1] As we shall discuss, Ms. Stevenson also named four other defendants in her complaint. By the time of the trials in this matter, the only remaining active claims were against Mr. Rochkind, Dear, and S&S.

Courts and Judicial Proceedings Article ("CJP"), Judge White reduced the judgment to $1,103,000.

Mr. Rochkind noted this appeal, presenting eleven questions for review, which we have combined and rephrased as follows:

I. Did Judge Sfekas err by ordering a partial new trial, instead of a full new trial, and did Judge White improperly narrow the issues to be re-tried?

II. In the First and the Second Trials, did the court err by declining to hold a *Frye-Reed* hearing and by ruling that Cynthia Hall-Carrington, M.D., could testify that the Fairview Property was a substantial contributing cause of Stevenson's elevated blood lead levels, that Ms. Stevenson's ADHD was caused by that lead exposure, and that Ms. Stevenson lost a specific number of IQ points as a result of that lead exposure?

III. In the Second Trial, did the circuit court err by not holding a *Frye-Reed* hearing to assess the methodologies employed by Mark Lieberman, a vocational counselor, and by permitting him to opine that, but for Ms. Stevenson's "cognitive defects," she would have functioned as an "average high school graduate"?

IV. In the Second Trial, did the court err by permitting Michael Conte, Ph.D to offer economic loss opinions premised solely on Mr. Lieberman's testimony, which should have been excluded?

V. In the Second Trial, did the court err by precluding Mr. Rochkind's economics expert from testifying about research that quantifies the loss of lifetime earnings caused by incremental increases in blood lead levels?

VI. In the Second Trial, did the court err by precluding defense counsel from cross-examining Dr. Conte about two exhibits introduced into evidence by Ms. Stevenson that showed that she may have been eligible for free job coaching?[2]

---

[2] Mr. Rochkind phrased his questions presented as follows:
A. The lower court erred in the first trial ("Stevenson 1") when, after determining post-trial that allowing Dr. Conte to testify was error, it ordered only a partial new trial.

(Continued…)

(…continued)

B. The lower courts erred by allowing Dr. Cynthia Hall-Carrington, to opine that lead paint from 3823 Fairview Avenue was a substantial contributing cause of Appellee's elevated blood lead levels despite the fact that Dr. Hall-Carrington (1) is a pediatrician with no experience in lead risk assessment, (2) performed no investigation into other known lead sources, (3) did not consider or rule out other potential lead sources, including prior residences, concurrent visitation properties or ambien[t ]sources, and (4) relied exclusively on records selectively provided to her by Appellee's counsel.

C. The lower courts erred by allowing Dr. Hall-Carrington to opine that (i) lead exposure can cause ADHD and (ii) lead paint from Appellant's property caused Appellee's ADHD, despite the fact that the overwhelming opinion of the relevant medical community is that heredity is the primary cause of ADHD; that the medical community does not know whether lead exposure caused or is even associated with ADHD; that Appellee's mother, brother and possibly father have all been diagnosed with ADHD; and that Dr. Hall-Carrington never examined Appellee or performed a differential diagnosis.

D. The lower courts erred by allowing Dr. Hall-Carrington to opine that Appellee's alleged injuries were caused by lead exposure at Appellant's property, despite the fact that she based her opinion/diagnosis exclusively on epidemiological studies of the *general population* (which she admitted cannot be used to diagnose *individuals*); never examined Appellee; never performed a differential diagnosis and failed to consider or account for Appellee's non-lead related problems.

E. The lower courts erred by allowing Dr. Hall-Carrington to opine that Appellee lost a specific number of IQ points as the result of alleged lead exposure (from any and all sources) based on studies involving the effect of lead exposure (from any and all sources) based on studies involving the effect [o]f lead exposure on the *general population* despite the fact that she has no experience in IQ testing, had no foundation for rendering such an opinion, and two Maryland appellate courts have held that rendering such an opinion is error.

F. The lower courts erred by rejecting Appellants' request to hold an evidentiary pretrial hearing on Appellee's experts (Dr. Hall-Carrington and Mark Lieberman) under *Frye-Reed* and/or Rule 5-702 to present expert testimony concerning the foundation, reliability and methodology employed by Appellee's experts.

(Continued…)

3

Ms. Stevenson noted a cross-appeal, presenting one question: Did the circuit court err by denying her request for attorneys' fees?

For the following reasons, we shall affirm the judgments of the circuit court.

**FACTS AND PROCEEDINGS**

---

(…continued)

    G. The first trial court erred when it granted a partial new trial on damages only (rather than a complete new trial), despite the fact that the issues of liability and damages were inextricably intertwined[.]

    H. The trial court committed error when it allowed Appellee's vocational expert to opine that Appellee would have functioned as an "average high school graduate" but for her "cognitive deficits," despite the fact that the expert had no qualifications or foundation for rendering such an opinion and purported to arrive at his opinion based on a methodology (the PEEDS-RAPEL Method) that does not purport to, and cannot be used to, predict educational attainment.

    I. The trial court committed error in excluding Appellant's expert economist from testifying about the generally accepted scientific research (including the numbers used by the Centers for Disease Control) that quantifies the loss of lifetime earnings caused by incremental increases in blood lead levels to rebut the testimony of Appellee's expert economist and as support for his own opinions[.]

    J. The trial court committed error when it allowed Appellee to introduce into eviden[c]e two exhibits "for all purposes" which showed that the Appellee was eligible for *free* job coaching, and then precluded Appellant from using this same evidence to cross-examine Appellee's expert economist who based his loss of income calculations on the assumption that the Appellee would never earn any future income *because she could not afford job coaching*.

    K. The trial court committed error when it allowed Appellee's expert economist to render economic loss opinions based solely on the opinions of Appellee's vocational expert, which themselves should have been excluded.

(Emphasis in original.)

4

Ms. Stevenson was born on December 22, 1990. Her mother, Charlena Montgomery, was 17 years old at the time. Ms. Stevenson was raised by her mother and her maternal grandmother, Lorena Cooks. Her father, Vernon Stevenson, was largely absent from her life. She has a maternal half-brother, who is 22, and a maternal half-sister, who is 16.

From birth until age nine months, Ms. Stevenson lived with Ms. Montgomery and Ms. Cooks at 2110 Clifton Avenue, in Baltimore City ("2110 Clifton Property"). According to Ms. Montgomery, the interior walls of that property were covered with wood paneling, the windows were vinyl, and there was no chipping, peeling, or flaking ("deteriorated") paint.

In October of 1991, Ms. Stevenson and Ms. Montgomery moved to the Fairview Property, a West Baltimore rowhouse that was built in 1930. Ms. Montgomery recalled that the interior of the property was repainted before they moved in. The painters simply covered over the existing flaking and chipping paint, however, and the paint soon deteriorated on the interior walls. There also was deteriorated paint on the wood windowsills, the ceilings, the heaters, and the front porch.

Ms. Stevenson lived at the Fairview Property for fifteen months. During that time, she started walking. She liked to look out the window. Ms. Montgomery saw her touching the windowsills and then her mouth, and licking the windows. Ms. Stevenson sometimes rested her food on the windowsill and ate while standing there.

For the first 13 months that she lived at the Fairview Property, Ms. Stevenson spent from 7 a.m. to 3 or 4 p.m., five days a week, at the house of a babysitter, while her

mother attended high school. The babysitter's house was located at 2114 Clifton Avenue ("2114 Clifton Property"), two doors down from the 2110 Clifton Property. The 2114 Clifton Property had been "gut rehabilitated" in 1985 and had new windows. There was no deteriorated paint at that property.

In January of 1993, soon after Ms. Stevenson turned two, she and Ms. Montgomery moved to what Ms. Montgomery called a "newer apartment," on Pennsylvania Avenue ("the Pennsylvania Avenue Property"). According to Ms. Montgomery, there was no deteriorated paint at that property.

Ms. Stevenson's blood was tested for lead four times, beginning when she was almost two years old and was living at the Fairview Property, and ending when she was seven years old. The results were as follows:

| Date | Blood Lead Level | Ms. Stevenson's Address |
|------|------------------|--------------------------|
| October 29, 1992 | 14 µg/dL | Fairview Property |
| January 8, 1993 | 13 µg/dL | Fairview Property |
| March 17, 1993 | 11 µg/dL | Pennsylvania Avenue Property |
| September 3, 1998 | 8 µg/dL | 424 Oxford Court, Baltimore City **or** 1809 Raynor Avenue, Baltimore City[3] |

---

[3] In her first amended complaint, Ms. Stevenson alleged that she lived at the Oxford Court address from 1996 to 1998 and at the Raynor Avenue address from 1998 to 1999.

When Ms. Stevenson was five years old, Ms. Montgomery took her to the Kennedy Krieger Institute ("KKI") for an evaluation because she was struggling to pay attention in school and was "hyper." Thomas Ley, Ph.D, a KKI psychologist, determined that Ms. Stevenson's cognitive functioning was within the "low average to borderline range," with a full scale IQ of 76 (+/- 5). He diagnosed her with Attention Deficit Hyperactivity Disorder ("ADHD"), for which he prescribed Adderal, and recommended further testing to rule out a developmental language disorder. Ms. Stevenson remained on Adderal until she was 14.

Beginning in the third grade, Ms. Stevenson was placed in special education classes. She was assigned a one-on-one aide who assisted her in school.

At age 13, Ms. Stevenson attempted suicide by cutting herself and overdosing on prescribed medication. The following year, in April of 2005, Ms. Montgomery took Ms. Stevenson to the Mount Washington Pediatric Hospital ("MWPH") for an evaluation. Ms. Stevenson was complaining of auditory hallucinations and depression. In May of 2005, a psychologist at MWPH tested Ms. Stevenson and determined that she had a full scale IQ of 65, which is in the "Extremely Low range of ability." She was diagnosed with major depressive disorder and generalized anxiety disorder.

Ms. Stevenson never was held back in school or suspended. In 2008, she graduated from high school. She then enrolled in a Division of Occupational Rehabilitation ("DORS") program for job training and coaching. Through the DORS

program, she found a job as a "transporter" for the University of Maryland Medical Systems. She was fired from that position, however.[4]

For about 10 months in 2012 and 2013, Ms. Stevenson was employed part-time at a Royal Farms store, in the kitchen and at the cash register. She quit because she was bored. In 2014, she worked as a babysitter for her cousin's children between the hours of 7 p.m. and 7 a.m., earning approximately $200 every other week. At the times of the trials in this matter, Ms. Stevenson was unemployed.

On December 19, 2011, Ms. Stevenson filed suit against Mr. Rochkind and the other defendants for negligence and unfair trade practices. The First Trial began on March 6, 2014. Ms. Stevenson testified and called three fact witnesses and nine expert witnesses in her case. Ms. Stevenson's and Ms. Montgomery's testimony was as we have recited the facts.

Christopher White, a certified lead risk assessor for Arc Environmental, Inc. ("Arc"), testified that, on July 13, 2012, Arc performed x-ray fluorescence ("XRF") testing on the interior and exterior surfaces of the Fairview Property. The XRF testing revealed 22 interior painted surfaces and nine exterior painted surfaces that were positive for the presence of lead-based paint. Inside the property, door jambs, window casings, baseboards, and door casings all tested positive. Mr. White opined that, based upon the age of the house, and the fact that lead-based paint has been prohibited for use in

---

[4] According to Ms. Stevenson, Ms. Montgomery "got [her] fired" after she showed up at work to check on her.

residential properties in Baltimore City since 1978, it was more likely than not that the lead-based paint had been present at the Fairview Property in 1991, when Ms. Stevenson and Ms. Montgomery moved in.

Robert Simon, Ph.D, an industrial hygienist, toxicologist, and lead risk assessor, testified, based on his review of the records in this case, that neither the 2110 Clifton Property, the 2114 Clifton Property, the Pennsylvania Avenue Property, nor other environmental lead were the source of Ms. Stevenson's lead exposure. He explained that because the 2110 Clifton Property had wood paneling throughout the interior, with the exception of a bathroom, and had vinyl windows, any lead-based paint was "encased" and was not a source of lead exposure. Similarly, because the 2114 Clifton Property had been gut-rehabilitated in 1985, had cement steps, new carpet, and no deteriorated paint, it was not a source of lead exposure. He had reviewed a 2010 Arc report that showed that XRF testing inside the vestibule area of the Pennsylvania Avenue Property was negative for lead-based paint; and he knew that Ms. Montgomery had testified that the paint at the Pennsylvania Avenue Property was not deteriorated.[5] According to Dr. Simon, this evidence ruled out the Pennsylvania Avenue Property as a source of Ms. Stevenson's lead exposure. In light of the age of the Fairview Property, the Arc testing of that property, and the observed presence of deteriorating paint at that property in the 1991-1993

---

[5] Because Arc was not able to enter the apartments inside the Pennsylvania Avenue Property, no XRF testing was performed inside the apartment where Ms. Stevenson had lived.

9

timeframe, Dr. Simon opined that there were lead-based paint hazards present at the Fairview Property when Ms. Stevenson lived there.

Robert Kraft, Psy.D, a psychologist, performed a neuropsychological evaluation of Ms. Stevenson on August 4, 2012. Her full scale IQ was 72, which is in the "borderline range of general intelligence," and her verbal IQ was 66, which is in the "extremely low range." Her verbal comprehension lagged far behind her perceptual reasoning skills, an indication of a language-based learning disability. Her memory and executive functioning skills were normal, however, and her motor functioning was above average. Dr. Kraft opined that Ms. Stevenson suffered from numerous cognitive deficits, including in general intelligence, attention, language function, visual motor functioning, and academic achievement. He further opined that these deficits are permanent and are likely to negatively affect her ability to find employment, manage her personal finances, and maintain social connections. (He offered no opinion about the cause of any of Ms. Stevenson's cognitive deficits.)

Cynthia Hall-Carrington, M.D., whose testimony we shall discuss in greater detail below, opined that the Fairview Property was a substantial contributing cause of Ms. Stevenson's elevated blood lead levels. Based upon Ms. Montgomery's answers to interrogatories and the Arc testing at the Pennsylvania Avenue Property, she ruled out the 2114 Clifton Property, the 2110 Clifton Property, and the Pennsylvania Avenue Property as sources of Ms. Stevenson's lead exposure. She testified that Ms. Stevenson was injured as a result of her elevated blood lead levels, opining that she suffered "deficits

and loss of IQ, as well as ADHD and academic decrements also." She estimated that Ms. Stevenson had lost between 5 and 6 IQ points as a result of lead exposure.

Mark Lieberman, a certified rehabilitation counselor, testified about Ms. Stevenson's vocational marketability. His ultimate opinion was that, although Ms. Stevenson graduated from high school, she will not function in the job market as an "average high school graduate." Rather, she only will be able to obtain "basic jobs," for example as a cashier or a lobby attendant, earning the minimum wage (then $7.25/hour), for an annual salary of around $15,000.[6] Jobs of this sort are likely to be part-time, 20-30 hours per week. In Mr. Lieberman's view, Ms. Stevenson will require job coaching on a weekly basis in order to maintain employment.

Dr. Conte, an economist, relied upon Mr. Lieberman's expert vocational opinion to render an opinion about Ms. Stevenson's potential future earnings and her loss of those earnings as a result of her cognitive impairments. He opined that, as an average high school graduate, Ms. Stevenson could have earned $1,636,458 in wages and fringe benefits over her lifetime. Her lifetime wages and fringe benefits as a minimum wage employee would be $806,753. The difference between those two figures—$829,705— was Ms. Stevenson's lost future earnings.

Mr. Rochkind testified that in 1984 he incorporated Dear and was its sole director. The following year, he purchased S&S and became its general partner. At that time, the

---

[6] In 2014, the General Assembly enacted legislation raising the minimum wage over a four year period. The minimum wage went up to $8.25 per hour in July 2015, and will go up to $8.75 in July 2016, $9.25 in July 2017, and $10.10 in July 2018.

Fairview Property was an asset of the partnership. In 1991, Charles Runkles was hired as the property manager for Dear. Dear was responsible for keeping the rental properties owned by S&S in compliance with the Baltimore City Housing Code lead-based paint prohibitions.

Mr. Runkles testified that Dear has no records about the Fairview Property from when Ms. Stevenson lived there. He was unable to recall whether Dear painted the property before Ms. Montgomery and Ms. Stevenson moved in and whether Dear received any complaints about the condition of the property while they lived there.

In his case, Mr. Rochkind called three expert witnesses: Neil Blumberg, M.D., a forensic psychiatrist; Cynthia Munro, Ph.D, a neuro-psychologist; and Joseph Sheller, M.D., a pediatric neurologist.

Dr. Blumberg reviewed Ms. Stevenson's medical records, her deposition, and Ms. Cooks's deposition. He met with Ms. Stevenson for two hours in May of 2013. He diagnosed her with "borderline intellectual functioning" and "major depressive [dis]order, single episode severe with psychotic features that is currently in full remission." He opined that Ms. Stevenson's cognitive impairment resulted from her home environment, coupled with genetic predisposition, and that if her IQ were 4 to 6 points higher she still would fall within the borderline range of intellectual functioning. He testified that Ms. Stevenson's "relatively mild" exposure to lead was not a substantial contributing factor to her cognitive impairment or to her depressive disorder.

Dr. Munro conducted a full-day neuropsychological evaluation of Ms. Stevenson, on April 8, 2013, and interviewed Ms. Montgomery that day. She measured Ms.

12

Stevenson's full scale IQ to be 74, which is in the borderline range (between 70 and 79), and her verbal IQ to be 70. She testified that individuals within the borderline range of intelligence have not necessarily suffered any brain injury. The result of other tests she performed were not consistent with Ms. Stevenson's having suffered a brain injury.

Dr. Munro diagnosed Ms. Stevenson with borderline intellectual functioning and major depressive disorder, in partial remission. She opined that genetic factors played "a large role" in Ms. Stevenson's cognitive impairment and that her evaluation of Ms. Stevenson revealed no evidence that she had brain damage caused by a toxic exposure. Dr. Munro did not diagnose Ms. Stevenson with ADHD or any attention deficit disorder. She explained that, because Ms. Stevenson had depression, and because depression affects attention, she could not make an attention deficit diagnosis. Moreover, she was not convinced that Ms. Stevenson ever should have been diagnosed with ADHD, given that the initial diagnosis at KKI was based largely on a questionnaire completed by Ms. Montgomery and, at the time of her diagnosis, Ms. Stevenson was not getting adequate sleep, which could have caused her attention difficulties.

Dr. Sheller met with Ms. Stevenson and Ms. Montgomery a few months before the First Trial and reviewed Ms. Stevenson's medical records. He diagnosed Ms. Stevenson with borderline intellectual functioning. Based upon his review of scientific studies about the neurological impact of blood lead levels similar to Ms. Stevenson's, he opined that she may have lost one to two IQ points as a result of her lead exposure. He testified that a difference of between one and six IQ points will not have any apparent effect on cognitive functioning. He noted that Ms. Stevenson's half-sister was evaluated at KKI

13

when she was 5 years old and that KKI could not rule out ADHD. He opined that there is "a very powerful genetic link" for ADHD and, given that Ms. Stevenson's mother, half-brother, father, and possibly her half-sister also have attention difficulties, it is not surprising that Ms. Stevenson has deficits in that area. He further opined that the majority of children outgrow ADHD symptoms in adulthood.

The case was sent to the jury on a special verdict that listed the following questions:

> 1. Do you find that [the Fairview Property] contained chipping, flaking, or peeling paint at the beginning of the tenancy?
> 2. Do you find that [Ms. Stevenson] has proven by a preponderance of the evidence that there was flaking, chipping and/or peeling lead-based paint at [the Fairview Property] during the relevant time period?
> 3. Do you find that Defendant, S&S Partnership acted negligently in its ownership and/or management of [the Fairview Property] during the relevant time period?
> 4. Do you find that Defendant, Dear . . . acted negligently in its management of [the Fairview Property] during the relevant time period?
> 5. Do you find that Defendant, . . . [Mr.] Rochkind, acted negligently in his ownership/operation of [the Fairview Property] during the relevant time period?
> 6. Do you find that [Ms. Stevenson] has proven by a preponderance of the evidence that she suffered injury as a result of lead exposure at [the Fairview Property]?
> 7. Do you find that [Ms. Stevenson] has proven by a preponderance of the evidence that she should be awarded non-economic damages?
> 8. What amount of damages, if any, do you award [Ms. Stevenson] as damages for her non-economic losses?
> 9. Do you find that [Ms. Stevenson] has proven by a preponderance of the evidence that she has suffered economic damages?
> 10. What amount of damages, if any, do you award [Ms. Stevenson] as damages for economic damages?

On March 18, 2014, the jurors returned their verdict. They answered questions 1 through 7 and question 9 in the affirmative. On question 8, they awarded Ms. Stevenson

14

$539,000 in non-economic damages and, on question 10, they awarded her $829,000 in economic damages.

Within ten days, Mr. Rochkind, S&S, and Dear moved to alter or amend or for a new trial or remittitur. As relevant here, they argued that the court erred by permitting Mr. Lieberman to express an opinion at trial that was not disclosed in discovery, and by permitting Dr. Conte to rely upon that new opinion to himself offer a new opinion. On April 28, 2014, the court heard argument on the defendants' motions.[7] It ruled that Dr. Conte's trial testimony was a new opinion never disclosed in discovery and that its admission had "unfair[ly] disadvantage[d]" the defense.[8] On that basis, it granted a new trial on economic damages. Because the jurors' assessment of non-economic damages may have been "skewed" due to their award of economic damages, the court also granted the defendants a new trial on non-economic damages. The court ruled that the jurors' findings with respect to liability would stand.

On the first day of the Second Trial, Judge White denied the defendants' renewed motions *in limine* pertaining to Mr. Lieberman and Drs. Hall-Carrington and Conte. In her case, Ms. Stevenson testified and called five witnesses from the First Trial: Dr. Kraft,

---

[7] On April 25, 2014, Judge Sfekas held a hearing and granted a partial new trial. Ms. Stevenson argued, pursuant to Rule 2-311(e), that because the court had not permitted her counsel to present any argument on the motions at that proceeding, it could not grant a partial new trial. The court agreed that it had acted improperly and vacated its ruling. It scheduled a new hearing on the motions for April 28, 2014.

[8] The court did not find that Mr. Lieberman's trial testimony included any new opinions not disclosed during discovery.

Mr. Lieberman, Dr. Hall-Carrington, Dr. Conte, and Ms. Montgomery. She also called two new lay witnesses: Alice Crowder, a DORS employee; and Jamie Weaver, Ms. Stevenson's supervisor at the Royal Farms store.

The testimony of Ms. Stevenson, Ms. Montgomery, Dr. Kraft, and Dr. Hall-Carrington did not differ from their testimony in the First Trial.

Mr. Lieberman, who had met with Ms. Stevenson in the interim between the trials, opined, as he had at the first trial, that her cognitive deficits made her employable only in "very low skill positions requiring limited independent decision making, limited ability to read and remember information and require a high level of supervision." These jobs would be part-time, involve "unskilled manual labor," and pay "at or near minimum wage." Mr. Lieberman reiterated his opinion that Ms. Stevenson would require the services of a job coach for "a couple hours a week" in order to maintain employment. He testified that a job coach typically charges $38 per hour.

Dr. Conte offered a new economic loss opinion at the Second Trial. In making his calculations, he assumed that Ms. Stevenson had a work-life expectancy of 32.5 years, that she would be employable in minimum-wage jobs working approximately 25 to 30 hours per week, and that she would require a job coach to maintain employment. He compared her lifetime earnings in that scenario to the lifetime earnings of an "African-American high school graduate." Based upon those assumptions, he opined that, "absent the deficits" described by Mr. Lieberman, Ms. Stevenson could have earned $1,595,114 over her lifetime. In contrast, her potential lifetime earnings with her deficits would be a

16

"net" "negative earnings" once the cost of job coaching was factored in. Therefore, the value of her lost wages and benefits was the full $1,595,114.

Ms. Crowder is a technical specialist with DORS, who assists youths with disabilities to transition into adulthood. She testified that she worked with Ms. Stevenson for about three years, helping her to obtain training and employment. Ordinarily, once a DORS client finds a job and maintains employment for 90 days, the client's case is closed. A DORS client who has "difficulty on the job" may contact DORS and request post-employment services, which might include job coaching or other services to help the client maintain employment. Ms. Crowder testified that Ms. Stevenson had been advised that she was eligible for supplemental security income ("SSI") benefits and that that made her eligible for DORS services cost-free.

Ms. Weaver testified that she worked at the Royal Farms store in Morrell Park for eight years and was the manager for three years, including when Ms. Stevenson worked there in 2012. She characterized Ms. Stevenson's job performance as "okay," noting that she "had to instruct her on what to do on a daily basis." Ms. Stevenson's attendance was "[f]air." When Ms. Stevenson worked at the cash register, she "seemed confused, like she was a new employee every day." She had a "[g]reat attitude" but did not retain skills. She could not be rehired at Royal Farms because the company has a "no rehire policy."

In his case, Mr. Rochkind again called Drs. Blumberg, Munro, and Scheller and also called two new witnesses: Michael Brookshire, Ph.D, an economist, and Robert Taylor, a rehabilitation counselor.

17

Dr. Blumberg's testimony was for the most part the same as his testimony in the First Trial. He modified his diagnosis of Ms. Stevenson slightly, based upon records he had reviewed in the interim between the trials. He explained that he originally had diagnosed Ms. Stevenson with a single episode of major depression that was now in full remission, but he now believed her major depressive disorder to be recurrent.

Drs. Munro and Scheller testified consistent with their testimony in the First Trial. Dr. Munro elaborated on her view that Ms. Stevenson's impaired cognitive functioning was caused by her genetic predisposition, coupled with her chaotic home environment and depressive disorder, and not by lead exposure.

Mr. Taylor was accepted by the court as an expert in vocational rehabilitation counseling. He testified, based upon Ms. Stevenson's vocational history and Dr. Munro's report, that Ms. Stevenson is capable of working full-time in a number of jobs, including as a food service worker, housekeeper, childcare worker, and in certain clerical jobs. In his view, she could earn more than the federal minimum wage in these jobs, estimating an income of between $18,000 and $21,000 a year. He opined that Ms. Stevenson's injuries linked to her exposure to lead had not resulted in any loss in earning capacity. Rather, her "significant barriers" to employment arose from other "confounding variables" in her life.

Dr. Brookshire testified that Ms. Stevenson had not "sustained any loss of earning capacity or work-life expectancy due to claimed exposure to lead" and there were "significant other issues that would have affected her academic and vocational outcomes." He opined that there was "no difference" between Ms. Stevenson's "pre- and

18

. . . post-injury earning capacity due to lead exposure" and the "total cost of additional rehabilitation services" required to assist her in finding full-time employment was in the range of $3,453 to $6,036.

At the conclusion of all the evidence, the jurors were asked to find the amount, if any, of economic and non-economic damages Ms. Stevenson sustained as a result of her exposure to lead-based paint at the Fairview Property. On November 3, 2014, the jury returned a verdict awarding Ms. Stevenson $753,000 in economic damages and $700,000 in non-economic damages.

Within ten days, Mr. Rochkind, S&S, and Dear moved for new trial or, in the alternative, for a remittitur, and, on December 10, 2014, Ms. Stevenson filed a motion for attorneys' fees.

On March 18, 2015, the court entered an order denying the motion for attorneys' fees. Within ten days, Ms. Stevenson moved for reconsideration of that order. On June 8, 2015, the court denied that motion.

Meanwhile, on April 2, 2015, the court denied the motion for new trial. The court reduced the judgment in accordance with the cap on non-economic damages and entered an amended judgment in the amount of $1,103,000.

On April 29, 2015, Rochkind noted this timely appeal. S&S and Dear did not note appeals.[9]

---

[9] In her original complaint and her first amended complaint, Ms. Stevenson alleged exposure to lead paint hazards and resulting injury at four other properties and

(Continued…)

sued the owners of those properties as well.  She alleged that the Mayor & City Council of Baltimore City ("Mayor & City Council") and Edgewood Management Corporation ("Edgewood"), owned and/or managed the Pennsylvania Avenue Property, where she lived for about a year after she moved out of the Fairview Property.  She alleged that the Housing Authority of Baltimore City ("HABC") owned two properties located at 1308 Hillman Street and 424 Oxford Court, where she lived from 1994 to 1996, and 1996 to 1998, respectively.  Finally, she alleged that Lawrence Polakoff owned a property located at 1809 Raynor Avenue, where she lived from 1998 until 1999.

On June 19, 2012, about a month after she filed her first amended complaint, Ms. Stevenson filed a notice of "Partial Voluntary Dismissal Without Prejudice" as to her claims against the Mayor & City Council and Edgewood, neither of which had been served.  On November 29, 2012, Mr. Polakoff was served by private process.  On December 3, 2012, HABC was served and, on December 12, 2012, it filed an answer.  Two months later, on February 20, 2013, Ms. Stevenson and HABC filed a joint "Stipulation of Dismissal Without Prejudice" as to the claims against HABC.  The record does not reflect that the claims against Mr. Polakoff ever were dismissed.

Ordinarily, a judgment that "adjudicates fewer than all of the claims in an action . . . or . . . less than an entire claim, *or that adjudicates the rights and liabilities of fewer than all the parties to the action*" is not final and appealable.  Md. Rule 2-602(a).  In the instant case, the claims against Mr. Polakoff remain outstanding and the judgment is not final.

Rule 2-602(b) permits a circuit court, in its discretion, to "direct . . . the entry of a final judgment . . . as to one or more but fewer than all of the claims or parties" upon a finding that there is "no just reason for delay."  Factors relevant to the exercise of that discretion include: "'a harsh economic effect' caused by delaying the right to appeal"; "the danger that the same issues will have to be considered by the appellate court on successive appeals"; "the possibility that 'the determination of the remaining [issues] before the trial court might utterly moot the need for the review now being sought'"; and "'whether entertaining the present appeal upon the merits would require us to determine questions that are still before the trial court.'" *Doe v. Sovereign Grace Ministries*, 217 Md. App. 650, 667 (2014) (citations omitted).

Pursuant to Rule 8-602(e), if this Court "determines that the order from which the appeal is taken was not a final judgment when the notice of appeal was filed but that the lower court had discretion to direct the entry of a final judgment pursuant to Rule 2-602(b), the appellate court may, as it finds appropriate, . . . enter a final judgment on its own initiative."  We exercise our discretion to do so in the instant case.  The factors weighing against the certification of a final judgment do not apply in this case and the circuit court plainly would have had discretion to certify the judgment against Mr. Rochkind, S&S, and Dear as final.  The claims against Mr. Polakoff were not a part of

Ms. Stevenson noted a timely cross-appeal from the denial of her motion for attorneys' fees and the denial of the motion for reconsideration thereof.

We shall include additional facts as necessary to our analysis of the issues.

**APPEAL**

**I.**

**Partial New Trial**

In the course of this litigation, Dr. Conte prepared several reports in which he opined about Ms. Stevenson's lost future earnings. In a report prepared in June of 2013, he calculated Ms. Stevenson's lost future earnings to be $1,010,319. Following a pre-trial evidentiary hearing on January 21, 2014, the court precluded Dr. Conte from expressing that opinion at trial because it was based upon the Gibson & Gamboa work-life expectancy tables, which the court found are not generally accepted in the economic community. On January 22, 2014, Dr. Conte issued a new report opining that Ms. Stevenson had sustained $556,413 in lost future earnings. He withdrew that report, however, and issued his final report on February 2, 2014. In it, he calculated Ms. Stevenson's lost future earnings to be $716,803. In doing so, he relied on the Millimet work-life expectancy tables, which he applied by placing Ms. Stevenson in the category for individuals having less than a high school degree.

---

(…continued)
the First Trial or the Second Trial. He was not a party to any of the pre-trial proceedings. We see no justification for further delaying the resolution of this appeal. Accordingly, we shall direct the entry of a final judgment against Mr. Rochkind, S&S, and Dear pursuant to Rule 8-602(e).

The defense moved to preclude Dr. Conte from expressing the opinion in his February 2, 2014 report at trial. The court held a hearing on the motion at the outset of the First Trial. It denied the motion, ruling that Dr. Conte's use of the Millimet tables was permissible, but directed that he place Ms. Stevenson in the category for high school graduates in applying those tables.

At trial, Dr. Conte testified that he had relied on Mr. Lieberman's expert vocational opinion in reaching his opinion about Ms. Stevenson's potential future earnings and loss of future earnings. Mr. Lieberman had opined that even though Ms. Stevenson graduated from high school, she would not be able to obtain the same jobs as an "average high school graduate" or command the same pay. Based on this opinion, Dr. Conte testified, for the first time, that

> had Ms. Stevenson not suffered from the cognitive deficits that she currently displays, that she would be able to compete in the labor market and command a salary of a typical high school graduate; but that because of what she's been through, she is most likely to be working in jobs that can command only a minimum wage.

Dr. Conte calculated that, "absent her current deficits," Ms. Stevenson could earn an annual salary of "$29,743 with relevant growth . . . which reflects the average salary of an African-American high school graduate in the U.S. economy" according to federal government statistics. At a minimum wage job, however, Ms. Stevenson would earn just $15,080 annually. He further calculated fringe benefits—including insurance, supplemental pay, paid leave, retirement contributions, and mandatory contributions—at 44.3% of salary. Based on these calculations, Dr. Conte opined that, as an "average high school graduate," Ms. Stevenson could have earned $1,636,459 in wages and fringe

22

benefits over her lifetime, but as an individual earning only the minimum wage she would earn $806,753 over her lifetime. The difference between those two figures—$829,706—was Ms. Stevenson's lost future earnings.

The court ruled that this opinion had not been disclosed to the defendants in discovery and amounted to an unfair surprise. It ordered a partial new trial, explaining as follows with regard to the issues to be retried:

> [T]he testimony in the case was that Ms. Stevenson had an elevated blood-level, that she lived at [the Fairview Property] for that period of time, and I think I'm not granting a new trial as to that issue. . . . .
>
> There will be no need, in a new trial, for testimony by either ARC or [Dr. Simon]. . . . .
>
> [The plaintiff will not] need to establish (a) that there was lead in the household; (b) that [Ms. Stevenson] was exposed to the lead in the household; (c) that she had an elevated lead level; and, (d) that the lead level that she had was, to a Substantial degree, the result of the exposure at that house. I think the jury had conclusively decided that. I'm going to let that portion stand.
>
> Therefore, the only issue that will be available for retrial will be: economic damages, non-economic damages and, of course, in both cases that will depend upon some analysis of the degree of injury to which she was subject. In other words, you know, the five to six point loss in IQ and the vocational impact that that would have had. As I said, I think there needs to be a proportional – some proportionate distribution of the damages as well, ok?

At the outset of the Second Trial, Judge White advised the parties that she had reviewed the verdict sheet from the First Trial and the transcripts of the hearings on the motion for new trial, and it was "absolutely apparent [to her] that the issues that [would be] going forward to the jury [in the Second Trial were] questions numbered 8 and 10 on the old verdict sheet." Those questions asked the jurors to determine the amount, if any,

23

of economic and non-economic damages to be awarded. Judge White stated that "[t]he causation issues were resolved by the first jury."

Mr. Rochkind (joined by S&S and Dear) argued that Judge White's reading of Judge Sfekas's ruling on the motion for new trial was too narrow. He maintained that he should be permitted to present evidence that Ms. Stevenson's injuries could be the result of a "lot of things going on in [her] life," not just lead exposure. He argued, moreover, that he should be able to present evidence and argue to the jury that Ms. Stevenson was not "damaged by this very modest level of lead exposure."

Judge White stated that she did not anticipate limiting the defendants' right to cross-examine Ms. Stevenson's experts or to present their own expert testimony bearing on "the nature of the injury and the severity of the injury." She precluded Mr. Rochkind from relitigating the issue of "causation . . . as to whether it was the Defendants' lead that caused the injury; *i.e.*, the lead exposure and elevated blood-lead levels." Thus, the only issues at the Second Trial would be "quantification of damages with attention to nature of injury, severity of the injury."

On appeal, Mr. Rochkind contends Judge Sfekas abused his discretion by granting only a partial new trial. He maintains that the issues of liability and damages were not "fairly severable," and therefore the only effective remedy for Dr. Conte's having expressed an opinion not disclosed before trial, to the prejudice of the defense, was a new trial on all issues. He further contends that Judge White erred by "limiting the scope of the [Second Trial] to damages only, despite the fact that the issues of liability and damages were inextricably intertwined." He argues that he should have been permitted to

24

introduce evidence and argue at the Second Trial that Ms. Stevenson's "*damages* were caused by lead from other properties or ambient sources." (Emphasis in original.)

Ms. Stevenson responds that Mr. Rochkind did not preserve this issue for review because he did not file a motion for reconsideration of Judge Sfekas's or Judge White's rulings. On the merits, she argues that the issue of damages was fairly severable from the liability issues, and therefore a new trial solely on damages was a proper remedy, and Judge White correctly limited the scope of the Second Trial to the "nature, extent, degree and quantification of the injuries."

There is no merit in Ms. Stevenson's preservation argument. Judge Sfekas's order granting a partial new trial was interlocutory and only could be challenged on appeal from the final judgment entered after the partial new trial. *See Buck v. Cam's Broadloom Rugs, Inc.*, 328 Md. 51, 56 (1992). Mr. Rochkind was not required to move for reconsideration of the denial of his motion for new trial on liability to preserve his challenge to that adverse ruling. Nor was he required to move for reconsideration of Judge White's ruling on the scope of the new trial to challenge that ruling on appeal.

Rule 2-533(c) permits a court to "set aside all or part of any judgment entered and grant a new trial to all or any of the parties and on all of the issues, or some of the issues if the issues are fairly severable." Mr. Rochkind relies on *Stickley v. Chisholm*, 136 Md. App. 305 (2001), to support his argument that Judge Sfekas abused his discretion by granting a partial new trial rather than a new trial on all issues because the issues of liability and damages were not "fairly severable."

25

In *Stickley*, a jury in a medical malpractice case found that the defendant doctor had breached the standard of care but his breach was not "the" proximate cause of the plaintiff's injury. On appeal, we held that the trial court erred by instructing the jurors that to find in favor of the plaintiff on proximate causation the doctor's breach had to be the sole cause of the plaintiff's injury. Invoking Rule 8-604(b), which permits an appellate court to reverse, in part, and affirm, in part, a judgment if it determines "that error affects a severable part of the action," the plaintiff sought to have the case remanded for a partial new trial on causation and damages only. *Id.* at 316.

We declined to do so, concluding that for this Court to remand for a partial new trial "'it must clearly appear that the effect of the error did not extend to all the issues tried.'" *Id*. at 317 (quoting *McBride v. Huckins*, 81 A. 528, 531, 532 (N.H. 1911)). We observed that the jurors may have compromised by finding in favor of the plaintiff on breach of the standard of care and in favor of the doctor on causation; and that "the issues of negligence and proximate cause are . . . intricately intertwined[.]" *Id*. at 317–18. Because it was not clear "that the effect of the erroneous jury instruction was limited to the issue of causation," we remanded for a new trial on all issues. *Id*. at 317–318.

In the case at bar, the jurors in the First Trial found that Ms. Stevenson was exposed to deteriorated lead-based paint at the Fairview Property; the exposure was a substantial contributing factor causing her elevated blood lead levels; and Mr. Rochkind (and S&S and Dear) violated their duty of care by failing to maintain that property so occupants would not be exposed to deteriorated lead-based paint. Those findings and the evidence bearing on them were distinct from the medical issues pertaining to whether Ms.

26

Stevenson's elevated blood lead levels resulted in a decrease in her IQ and in ADHD. Pure damages evidence, such as Dr. Conte's expert opinion about lost future earnings, was even farther removed from the duty and source of lead evidence, and it was Ms. Stevenson's failure to timely disclose that damages opinion that was the sole ground on which the new trial motion was granted. Judge Sfekas did not abuse his discretion by ruling that the damages issues were severable from the liability issues.

Finally, Judge White did not misinterpret Judge Sfekas's ruling or abuse her discretion in limiting the scope of the Second Trial to the issues of economic and non-economic damages. Mr. Rochkind was given wide latitude to present evidence bearing on the nature and degree of Ms. Stevenson's injuries and their causes, including expert testimony of Drs. Blumberg, Munro, and Sheller that Ms. Stevenson's impaired cognitive function and ADHD resulted from genetic predisposition, not from lead exposure. The court properly restricted Mr. Rochkind from arguing that Ms. Stevenson's elevated blood lead levels, and resulting injuries, were caused by lead exposure at other properties or from ambient lead.

## II.

### Dr. Hall-Carrington

Before the First Trial, Mr. Rochkind filed four motions *in limine* seeking to preclude Dr. Hall-Carrington from expressing at trial one source of lead causation opinion and three medical causation opinions. Specifically, he moved to preclude Dr. Hall-Carrington from opining that the Fairview Property was a substantial contributing factor in causing Ms. Stevenson's elevated blood lead levels and from opining that Ms.

27

Stevenson's exposure to lead, as manifested by her elevated blood lead levels, caused "cognitive defects" and "behavioral problems," the loss of a specific number of IQ points, and ADHD.

Mr. Rochkind requested *Frye-Reed* hearings on each motion. Judge Sfekas denied that request. On January 13, 2014, he heard argument on the motions *in limine* and denied them. Before the Second Trial, Mr. Rochkind renewed his motions *in limine*. Judge White heard argument on the first day of the Second Trial and denied the motions as well.

### A. *Expert Testimony Generally*

Rule 5-702 provides that a court may admit expert testimony if the court

> determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court "shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

The decision to admit or exclude expert testimony under Rule 5-702 is reviewed for abuse of discretion. *Rollins v. State*, 392 Md. 455, 500 (2006). A court's "action in admitting or excluding such testimony will seldom constitute a ground for reversal." *Bryant v. State*, 393 Md. 196, 203 (2006) (citations omitted). Thus, we must uphold the court's decision to admit Dr. Hall-Carrington's opinion testimony "unless we conclude that [the court] acted arbitrarily or capriciously . . . or that 'no reasonable person would share the view taken by the [court].'" *Taylor v. Fishkind*, 207 Md. App. 121, 137 (2012),

28

*cert denied*, 431 Md. 221 (2013) (quoting *Brown v. Daniel Realty Co.*, 409 Md. 565, 601 (2009)) (alteration in *Taylor*).

Expert testimony that is based on a novel scientific method also must satisfy the general acceptance test of *Frye-Reed* to be admissible. *See Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923); *Reed v. State*, 283 Md. 374, 389 (1978) (adopting the *Frye* standard). Under that test, the proponent of the expert testimony must show that it is "based on a scientific method or principle that has gained general acceptance in the relevant scientific community." *Ross v. Housing Authority of Baltimore City*, 430 Md. 648, 660 n.10 (2013). The "general acceptance" test is an assessment of the validity and reliability of a given scientific method or principle. *Blackwell v. Wyeth*, 408 Md. 575, 585 (2009). If the "validity and reliability of a scientific technique [or principle] [is] . . . broadly and generally accepted in the scientific community," a court may take judicial notice of its reliability. *Reed*, 283 Md. at 380. If that is not the case, "the reliability [must] be demonstrated before testimony based on the technique [or principle] can be introduced into evidence." *Id.* In this way, *Frye-Reed* is "deliberately intended to interpose a substantial obstacle to the unrestrained admission of evidence based upon new scientific principles." *Id.* at 386 (citation omitted).

### B. Dr. Hall-Carrington's Source of Lead Causation Opinion

Dr. Hall-Carrington is a practicing pediatrician who has been assessing children for lead exposure for over twenty years. At both trials, she explained that the most common way in which young children are exposed to lead is by ingestion of lead-based paint chips, flakes, and dust.

29

Dr. Hall-Carrington opined that the Fairview Property was a substantial contributing factor causing Ms. Stevenson's elevated blood lead levels. In preparation for trial, she reviewed Ms. Stevenson's and Ms. Montgomery's answers to interrogatories and deposition testimony; Dr. Simon's report; a printout from the State Department of Assessments and Taxation for the Fairview Property; and the Arc report about the Fairview Property. She based her source of lead opinion on Ms. Montgomery's testimony that there was deteriorated paint at the Fairview Property and that Ms. Stevenson had engaged in hand-to-mouth activities in the vicinity of the deteriorating paint at that property; the Arc report confirming the presence of lead-based paint in numerous interior areas of that property; and Ms. Montgomery's interrogatory answers, from which other possible sources of lead, including the 2114 Clifton Property, the 2110 Clifton Property, the Pennsylvania Avenue Property, and environmental sources of lead, such as fishing weights and glazed pottery, could be ruled out.

Mr. Rochkind contends that the court abused its discretion by allowing Dr. Hall-Carrington to opine about the source of Ms. Stevenson's lead exposure. He complains that Dr. Hall-Carrington "is a pediatrician, not a lead risk assessor" and she did not perform any tests on the Fairview Property or "investigate other known, potential sources of lead exposure." He relies upon *Taylor v. Fishkind, supra, Ross v. Housing Authority, supra, Hamilton v. Dackman*, 213 Md. App. 589 (2013), *cert. denied*, 439 Md. 329 (2014), and *Roy v. Dackman*, 445 Md. 23 (2015), to argue that Dr. Hall-Carrington was not qualified to offer a lead source causation opinion because she failed to "rule out all other possible sources of lead."

30

Ms. Stevenson responds that, as a pediatrician practicing in Baltimore City and assessing children for lead exposure, Dr. Hall-Carrington was qualified to opine that the Fairview Property was a substantial contributing cause of her elevated blood lead levels. She argues that Dr. Hall-Carrington's opinion was supported by an adequate factual foundation because, unlike the cases on which Mr. Rochkind relies, here, there was direct evidence of lead-based paint in more than twenty locations inside the Fairview Property. That direct evidence, coupled with Ms. Montgomery's deposition testimony and Dr. Simon's report, amply supported Dr. Hall-Carrington's opinion that the lead-based paint known to be present at the Fairview Property was a substantial contributing factor causing Ms. Stevenson's elevated blood lead levels.

In *Roy v. Dackman*, the Court of Appeals held that the trial court in a lead paint case did not abuse its discretion by precluding the plaintiff's expert pediatrician from offering opinions at trial about the source of the lead the plaintiff was exposed to.[10] In that case, there was no direct evidence of the presence of lead paint inside the subject property and the expert's source of lead opinion "was based solely on scant circumstantial evidence, including the age of the home and exterior tests of the paint on the dwelling." *Id.* at 47. The Court observed that "it is not enough for an expert to conclude that a certain property is the source of the child's exposure to lead when other probable sources have not been eliminated"; and the expert's proffered testimony did not

[10] As we shall discuss below, the Court also addressed whether the trial court abused its discretion by precluding the same expert from testifying about medical causation.

rule out other probable sources. *Id.* at 47-48. The Court held that in the absence of direct evidence of the presence of lead-based paint in the subject property and of evidence ruling out other probable lead sources, the expert "was not competent to testify as to the source of [the plaintiff's] exposure." *Id.* at 47.

The *Roy* Court explained that its holding regarding the expert's competency to testify about source of lead was in keeping with its decision in *Ross v. Housing Authority, supra*, in which it upheld the trial court's ruling precluding the plaintiff's pediatrician expert from giving a source of lead opinion when there was no direct evidence of lead-based paint inside the subject property except on one stair riser; the only evidence of such paint on windows was for exterior windows and the expert was basing her opinion that lead-based paint was present at the subject property on the age of the house.

*Roy*, *Ross*, and the other cases Mr. Rochkind relies upon to argue that Dr. Hall-Carrington should have been precluded from giving a source of lead opinion are distinguishable. Here, there was direct evidence of the presence of lead-based paint throughout the interior of the Fairview Property. Arc testing in 2012 revealed 22 interior surfaces with lead-based paint. Dr. Hall-Carrington based her lead source causation opinion on the direct evidence of the presence of lead-based paint in the Fairview Property; Dr. Simon's opinion that because lead-based paint has been illegal to use in Baltimore City residences since 1978, the lead-based paint detected in the Fairview Property in 2012 would have been present when Ms. Stevenson was living there, and that the 2110 Clifton Property, the 2114 Clifton Property, and the Pennsylvania Avenue Property were not sources of lead paint exposure; Ms. Montgomery's testimony that the

32

paint inside the Fairview Property was deteriorated when she and Ms. Stevenson were living there, and that she saw Ms. Stevenson put paint in her mouth; Ms. Montgomery's deposition testimony from which other environmental sources of lead, such as soil, leaded glazed pottery, and fishing weights, could be ruled out; and her own knowledge and expertise as a pediatrician with experience evaluating and treating children with lead poisoning. *Compare with Taylor*, 207 Md. App. at 141–42 (court's ruling precluding opinion testimony by plaintiff's lead source expert upheld when there was no direct evidence of lead-based paint inside the property, evidence only of such paint on one exterior window, and expert's opinion was "pure speculation"); *Hamilton*, 213 Md. App. at 589 (court's ruling precluding plaintiff's lead source expert opinion upheld when there was no direct evidence of lead-based paint in the property, there was only a positive finding of lead paint on an exterior transom, and the expert was assuming that lead paint was present due to the age of the property).

Dr. Hall-Carrington's expert opinion about source of lead was not a "transform[ation of] thin evidence or assumptions into viable causal connections." *Hamilton*, 213 Md. App. at 608. Her opinion was grounded in fact, and the trial court did not abuse its discretion by admitting it.

## C. Dr. Hall-Carrington's Medical Causation Opinions

In preparation for the First and Second Trials, Dr. Hall-Carrington reviewed Ms. Stevenson's medical and school records, Dr. Kraft's report, and the deposition testimony noted above. She did not examine Ms. Stevenson or meet with her. She explained that

that was not necessary because adults who have been exposed to lead as children typically do not exhibit symptoms in a clinical examination.

In her testimony in both trials, Dr. Hall-Carrington detailed the ways in which lead affects brain development in young children. She recounted that scientific studies have confirmed that there is a causal relationship between blood lead levels in excess of 10 µg/dL in children and cognitive impairments and "externalizing behaviors." She opined that Ms. Stevenson sustained "brain impairment" from her exposure to lead; that "the extent of her injuries [had] affected her cognitive development, as well as her academic level of achievement"; and that she did not have other risk factors for cognitive impairment, such as premature birth or head injury. She further opined that Ms. Stevenson's "cognitive defects, . . . her academic achievement, and learning disabilities," as well as her ADHD, were "caused" by her exposure to lead. She explained that anxiety and depression also "can be associated with exposure to lead" and that Ms. Stevenson's anxiety about school could have been caused by her poor academic performance and inability to focus. As noted, Dr. Hall-Carrington quantified Ms. Stevenson's cognitive impairment, opining that she lost between five and six IQ points as a result of lead poisoning. A factual "basis" for her medical causation opinion was the evidence that Ms. Stevenson had ingested deteriorated lead-based paint at a "vulnerable age" when children's brains are "more susceptible to the effects of lead."

**1) _ADHD Opinion_**

In his motion *in limine* seeking to exclude Dr. Hall-Carrington's opinion that Ms. Stevenson's exposure to lead-based paint caused her ADHD, Mr. Rochkind argued that

there is no consensus in the scientific community about the etiology of ADHD, much less that exposure to lead in early childhood causes ADHD. Rather, the consensus is that genetics plays a major role in ADHD. In support, he cited CDC reports, information on the website of the National Resource Center on ADHD, a National Institute of Mental Health ("NIMH") report, and an article in the *Journal of Clinical Psychology*, all of which conclude that ADHD is a condition that runs in families. In addition, he referenced a 2008 article published by the American Academy of Pediatrics ("AAP"), which concludes that 80% of the etiology of ADHD is genetic, and described it as a "highly heritable disorder." He also cited a decision by a federal district court in Oklahoma excluding an expert witness opinion that lead exposure causes ADHD. *See Palmer v. Asarco, Inc.*, 510 F. Supp. 2d 519, 531 (N.D. Okla. 2007).[11]

In her opposition to the motion *in limine*, Ms. Stevenson argued that there is a consensus in the scientific community that exposure to lead at or above certain levels "causes brain injury and other behavioral changes." In support, she relied upon a 2013 publication by the Environmental Protection Agency entitled "Integrated Science

_____

[11] In *Palmer*, the plaintiffs, seven children exposed to low levels of lead from mining waste at a superfund site, designated a psychologist to testify that lead exposure had caused one of them to suffer from ADHD. (The others were not diagnosed with ADHD.) The district court held a *Daubert* hearing and excluded the psychologist's opinion. The court emphasized that the psychologist had not identified or referenced "any scientific literature showing that lead exposure can cause ADHD" and had cited a 2002 CDC study finding "no compelling evidence that an [elevated blood lead level] increases a child's risk for [ADHD]." 510 F Supp. at 531 (alteration in original). The court noted, moreover, that the psychologist did not "state with any certainty how closely lead exposure and ADHD were related." *Id*. Because the psychologist did not reference any scientific support for her opinion, the court ruled it inadmissible.

Assessment for Lead" ("*EPA-ISA*"). The publication is the product of a team of scientists and technical experts and consists of analyses, based on peer reviewed medical publications and scientific studies, of the health effects of lead exposure. "The ISA provides a concise review, synthesis, and evaluation of the most policy-relevant science to serve as a scientific foundation for the review of the National Ambient Air Quality Standards (NAAQS)." *EPA-ISA* at xliv. "The fundamental process for developing an ISA includes . . . literature searches; . . . study selection; . . . evaluation and integration of the evidence; and . . . development of scientific conclusions and causal judgments." *Id.*

The *EPA-ISA* classifies numerous health conditions associated with lead exposure into five categories: "Causal relationship," "Likely to be a causal relationship," "Suggestive of a causal relationship," "Inadequate to infer a causal relationship," and "Not likely to be a causal relationship." *Id*. at lxii. In Table ES-1, the publication provides a "[s]ummary of causal determinations for the relationship between exposure to Pb and health effects." *Id.* at lxxxiii. It concludes that in children there is a "[c]ausal relationship" between exposure to certain levels of lead and the "Externalizing Behaviors" of "Attention, Impulsivity and Hyperactivity." *Id*. At Section 4.3.15.2, the publication expounds upon that finding:

> Attention, impulsivity, and hyperactivity are evaluated together because they are included within the attention deficit hyperactivity disorder domain of externalizing behaviors (as reviewed in Whitcomb and Merrell, 2012). Although examined less extensively than cognitive function, a causal relationship between Pb exposure and attention decrements, impulsivity, and hyperactivity in children is supported by multiple lines of evidence: 1) findings from prospective studies in diverse populations for associations with blood or tooth Pb levels; 2) coherence with evidence in animals with

36

relevant Pb exposures and; 3) evidence for plausible modes of action. (<u>Table 4-17</u>).

*Id.* at 4-289 (emphasis in original).

Table 4-17, which appears at pages 4-311 through 4-323 of the *EPA-ISA*, details, in pertinent part, the associations found "from multiple, high quality epidemiologic studies with relevant Pb levels," identifying the studies by author, publication, and date, describing the supporting evidence, and specifying the "Pb Biomarker Levels Associated With Effects." *Id*. at 4-314. Those levels include in children "with age 30 months > 10 μg/dL" of blood lead. The "modes of action," meaning the ways in which lead exposure brings about the detrimental externalizing behaviors are the same modes by which lead exposure brings about cognitive function decrements: impaired neuron development; decrease in development of synapses; and changes in neurotransmitters.

The table sets forth the conclusions that there is a "Causal" relationship between "cognitive function decrements in children" and exposure to lead at low levels (in the range of Ms. Stevenson's blood lead levels); a "Causal" relationship between exposure to lead at low levels and "Externalizing Behaviors: Attention, Impulsivity, and Hyperactivity in Children"; and a "Likely Causal" relationship between "Internalizing Behaviors in Children," such as anxiety and depression, and exposure to low levels of lead. *Id*. at 4-311, 4-314, & 4-317.

Ms. Stevenson also cited in her opposition a 2005 "Policy Statement" about lead exposure in children by the AAP's Committee on Environment Health. In a section of the Policy Statement entitled "Toxicity of Lead," the committee states that studies show

37

that exposure to lead causes IQ decrements in children and affects "other aspects of brain or nerve function, especially behavior." Specifically, children with "elevated tooth lead concentrations were more inattentive, hyperactive, disorganized, and less able to follow directions"; and elevated "bone lead concentrations" has been associated with "increased attentional dysfunction."

Ms. Stevenson maintained that she did not have to prove that her elevated blood lead levels were the *only* cause of her ADHD; she only had to prove substantial factor causation. Moreover, she was not "required to rule out every other potential source or cause of ADHD or brain injury." It was sufficient for Dr. Hall-Carrington to opine that Ms. Stevenson's lead exposure "contributed to her ADHD." Finally, Ms. Stevenson argued that her injuries, including ADHD, are "indivisible as a matter of law." She pointed to Dr. Hall-Carrington's testimony in deposition that it is impossible to quantify how much of her learning difficulties are due to lead exposure and how much are due to social factors.

As noted, the court denied the motions *in limine.* At trial, Dr. Hall-Carrington relied upon the studies Ms. Stevenson cited in opposition to the motions and a study authored by Bruce Lanphear ("the Lanphear Study") to support her ADHD (and IQ) opinions.[12]

---

[12] *See* Bruce Lanphear, *et al, Low-Level Environmental Lead Exposure and Children's Intellectual Function: An International Pooled Analysis*, 113 Envtl. Health Perspectives 894 (July 2005).

Before this Court, Mr. Rochkind offers three arguments as to why the court abused its discretion in admitting Dr. Hall-Carrington's ADHD causation opinion. First, relying upon *Blackwell, supra*, he maintains that the trial court was required to hold a *Frye-Reed* hearing before ruling on the admissibility of Dr. Hall-Carrington's ADHD causation opinion; *and* that the outcome of a *Frye-Reed* hearing should have been to preclude admission of that opinion. Second, and relatedly, Mr. Rochkind asserts that Dr. Hall-Carrington's opinion as expressed at trial did not meet the threshold to prove general medical causation, *i.e.,* that low level lead exposure *can cause* ADHD. Finally, he maintains that Dr. Hall-Carrington's opinion was further deficient in that it failed to establish specific medical causation, *i.e.,* that her exposure *in fact* caused her to develop ADHD. We do not find merit in any of these arguments.

In *Blackwell*, the plaintiff proposed to call Mark Geier, M.D., to opine that thimerosal, a preservative containing ethyl-mercury that is used in certain childhood vaccines, can cause autism in a "subset" of neurologically vulnerable children. 408 Md. at 611. The trial court held a *Frye-Reed* hearing. The defendant presented the findings of the National Academy of Sciences' Institute of Medicine's ("IOM") Committee reports from 2001 and 2004, the first of which concluded there is no evidence to support a link between thimerosal in vaccines and autism and the second of which concluded that the evidence favored "rejection of a causal relationship." *Id*. at 599. These findings were based on large scale epidemiological studies.

Dr. Geier was prepared to opine at trial, contrary to the IOM Committee reports, that a causal relationship exists between thimerosal-containing vaccines and autism. The

only basis for his opinion was his own "epidemiological analysis" of publically available vaccine data, and the only published epidemiological studies purporting to show such a causal link had been undertaken by Dr. Geier and his son. *Id.* at 600. Those studies had been strongly criticized in the scientific community and were not generally accepted or reliable. Moreover, the scientific consensus was that autism is genetic in etiology except in rare instances and that thimerosal in vaccines does not cause autism. *Id.* On that basis, the trial court ruled at the conclusion of the *Frye-Reed* hearing that Dr. Geier's causation testimony was not admissible. Without Dr. Geier's expert opinion testimony, the plaintiffs could not establish a prima facie case, and the case was decided in favor of the defendant as a matter of law.

The case reached the Court of Appeals, which affirmed. It explained that although Dr. Geier's "underlying data and methods for gathering this data [were] generally accepted in the scientific community," he had "applied [that data] to support a novel theory." *Id*. at 596. Even if the underlying methodology was generally accepted, that did not "mandate acceptance of conclusions ostensibly developed therefrom." *Id*. at 589. The Court gave as an example *Wilson v. State*, 370 Md. 191 (2002), in which it had held that an expert witness for the State in a criminal prosecution should not have been permitted to opine that the statistical probability of two babies in the same family dying from SIDS with cerebral swelling was 1 in 4 million. The opinion had been offered to support the State's theory that the death of the second baby was not caused by SIDS, but by shaken baby syndrome, *i.e.,* that the defendant had shaken the baby to death. The 1 in 4 million figure was arrived at by squaring the statistical rate of one baby dying from

40

SIDS with cerebral swelling. The Court explained that there was a lively debate in the scientific community about the role of genetics in SIDS deaths and there was no scientific consensus that there was not a genetic component to SIDS. Thus, although the statistical analysis was based on sound methods, the conclusions drawn were not sufficiently reliable to satisfy the *Frye-Reed* general acceptance test.

The *Blackwell* Court noted that several federal courts have been called upon "to scrutinize the *reliability* of the analytical framework utilized by an expert in formulating a novel theory of science." 408 Md. at 605 (emphasis in original). In *General Electric Company v. Joiner*, 522 U.S. 136 (1997), the district court precluded the plaintiff's expert witness from opining that the plaintiff's small cell lung cancer was caused by PCBs and PCB derivatives. The Eleventh Circuit reversed, reasoning that experts may draw "different conclusions from the research," and when they do, the issue is one for the jury to decide. *Id.* at 141. The Supreme Court granted a petition for writ of *certiorari* and reversed. Emphasizing that "conclusions and methodology are not entirely distinct from one another[,]" the Court held that a trial court need not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* at 146. Such was the case with Dr. Geier's opinion in *Blackwell* that thimerosal is causally connected to autism.

The only similarity between *Blackwell* and the case at bar is that neither one concerned the general reliability of a scientific method which is the usual circumstance calling for a *Frye-Reed* hearing. Otherwise, the cases are entirely distinct, and the

41

holding in *Blackwell* does not support the conclusion that the trial court in this case abused its discretion by not holding a *Frye-Reed* hearing. Dr. Geier's scientific conclusion, from his own epidemiologic studies, that the thimerisol in certain vaccines causes autism had been universally *rejected* in the scientific community and, indeed, had been disproven through numerous other epidemiologic studies. To this day, scientists are searching for the cause or causes of autism.

By contrast, for decades, beginning in the 1970s, it has been widely accepted that lead exposure at levels insufficient to produce acute illness nevertheless causes deleterious health effects, especially cognitive deficits in children. Unlike in an autism case like *Blackwell*, where the fundamental issue is whether there is any causal connection between thimerisol exposure and autism, in lead paint cases such as this there is no controversy over the basic question whether lead paint exposure *can cause* health deficits in children. Rather, the causation disputes concern which health deficits in children are caused by lead exposure and the level of exposure that will produce them.

As we have explained, Ms. Stevenson's opposition to the motion *in limine* showed that Dr. Hall-Carrington's ADHD causation opinion was based on epidemiologic studies, many of which were compiled and analyzed in the *EPA-ISA* and supported its finding of a causal link between low-level lead exposure in children and the constellation of symptoms that form ADHD. Those studies used methodologies that are generally accepted and their conclusions were not novel in the sense used by the Court in *Blackwell*. In these circumstances, the trial court did not abuse its discretion by denying a *Frye-Reed* hearing.

42

Mr. Rochkind's related argument about general medical causation is based on his assertion that the *EPA-ISA* study is not in line with the consensus in the scientific community that the cause of ADHD, although unknown, is primarily genetic. He points out that Dr. Hall-Carrington herself acknowledged that there is a "genetic component" to ADHD and estimated that the condition is 60% hereditary. She also acknowledged that she could not quantify the effect of genetics versus lead exposure on attention, impulsivity, and hyperactive behaviors, but only could opine that lead exposure was "additive."

Although the scientific studies and publications Mr. Rochkind cited support the view that ADHD is largely genetic, they do not rule out environmental causes, and some expressly rule in lead as a risk factor. As we have explained, the *EPA-ISA* and other studies Dr. Hall-Carrington relied upon support a causal relationship between lead exposure and ADHD. The Court in *Roy v. Dackman* made clear that "even if [a particular scientific] study is contrary to the results of other studies," the fact that an expert witness relies upon that study "does not invalidate the entire basis of his [or her] opinion." 445 Md. at 51-52 n.16. Rather, "[s]uch is the grist for cross-examination and dueling experts and for resolution by the relative weight assigned by the fact-finder." *Id.* at 52 n.16.

With respect to specific medical causation, Mr. Rochkind argues that Ms. Stevenson's family history of ADHD is a confounding factor that undermined the validity of any opinion that Ms. Stevenson's ADHD was caused by exposure to lead. The trial court also did not abuse its discretion by permitting Dr. Hall-Carrington to testify that

Ms. Stevenson's lead exposure was a specific cause of her ADHD symptoms. As noted, Dr. Hall-Carrington testified that there is a large genetic component to ADHD, but that lead exposure is an additive causal factor. She acknowledged that Ms. Stevenson's mother had been diagnosed with ADHD, as had her half-brother. Her half-brother also had been exposed to lead and had elevated blood lead levels, however. Ms. Stevenson's half-sister had not been exposed to lead and had not been diagnosed with ADHD.[13] The issue of specific medical causation in this case is governed by the substantial factor test. Dr. Hall-Carrington's opinion that lead was *a* substantial causal factor contributing to Ms. Stevenson's ADHD symptoms was supported by an adequate factual basis and was sufficient to allow the jury to decide the causal connection, if any, between lead exposure and Ms. Stevenson's ADHD.

### 2) *IQ Loss Opinion*

In his motion *in limine* seeking to exclude Dr. Hall-Carrington's opinion quantifying Ms. Stevenson's IQ loss, Mr. Rochkind argued that the doctor's calculations were not reliable under *Frye-Reed* and lacked an adequate factual basis under Rule 5-702(3). Specifically, he maintained that: 1) Dr. Hall-Carrington relied, improperly, on general population studies to extrapolate that Ms. Stevenson had lost a specific number of IQ points; 2) there is no consensus in the scientific community about a methodology for

---

[13] Mr. Rochkind's experts noted that Ms. Stevenson's half-sister had been evaluated for possible ADHD as a child, but was not diagnosed due, in large part, to the fact that she was then sleep-deprived. Dr. Munro opined that Ms. Stevenson's diagnosis of ADHD at age 5 may have also resulted from the failure to rule out confounding factors, such as sleep deprivation.

calculating IQ loss in a child exposed to lead; and 3) Dr. Hall-Carrington's methodology of using Ms. Stevenson's peak blood-lead level to calculate IQ loss was at odds with the very studies she claimed to rely upon. He attached excerpts from Dr. Hall-Carrington's deposition testimony in which she could not explain why she had chosen to use Ms. Stevenson's peak blood-lead level, as opposed to her lifetime average, even though the Lanphear Study, which she relied upon for her calculations, had used an average. She also could not define the term "lifetime average" as used in the Lanphear Study, noting that she was "not an epidemiologist." As discussed, Judge Sfekas declined to hold a *Frye-Reed* hearing to assess the basis for Dr. Hall-Carrington's opinions and denied the motion to exclude her IQ opinion.

At both trials, Dr. Hall-Carrington testified that she had reviewed epidemiologic studies concerning the effects of lead on IQ decrements, and opined that there is "consensus among the studies that children do lose IQ points based on exposure to lead," although studies "differ in the amount of IQ points that children lose." Based on her review of those studies, Dr. Hall-Carrington opined that, "within a reasonable degree of medical certainty," Ms. Stevenson lost between five and six IQ points as a result of her exposure to lead.

On cross-examination, Dr. Hall-Carrington agreed that maternal and paternal IQ, a chaotic home environment, and moving between many residences and schools all are risk factors for cognitive impairment in children. She did not have any information about Ms. Montgomery's IQ or Ms. Stevenson's father's IQ, but did note that Ms. Stevenson's father was in special education classes during his secondary education. She

45

acknowledged that she had "no way of quantifying" the effect of confounding factors, if any, on Ms. Stevenson's IQ. When asked whether she used Ms. Stevenson's peak blood lead level (14 µg/dL) or her average blood-lead level (11.5 µg/dL) in forming her opinion about the total IQ loss caused by lead exposure, she responded that, based upon the Lanphear Study, she used Ms. Stevenson's peak blood lead level and calculated an IQ loss of 3.9 points based upon a level of between zero and ten, 0-10 µg/dL and an additional loss of 1.9 points for the level between 10 and 20 µg/dL, for a total of 5.8. She explained that her opinion would not have changed if she had used Ms. Stevenson's average blood lead level.

Mr. Rochkind argues that the trial court abused its discretion by permitting Dr. Hall-Carrington to opine that Ms. Stevenson lost a specific number of IQ points as a result of lead exposure because the doctor relied on general population studies to form that opinion and because she had no experience administering or interpreting IQ test scores. In the alternative, he argues the trial court erred by declining to hold a *Frye-Reed* hearing and/or a Rule 5-702 hearing to assess the admissibility of Dr. Hall-Carrington's IQ loss opinion. He relies, primarily, on *City Homes, Inc. v. Hazelwood*, 210 Md. App. 615, *cert. denied*, 432 Md. 468 (2013). Ms. Stevenson takes the position that *Roy v. Dackman* abrogated *Hazelwood*, and is dispositive on this issue.[14]

---

[14] The Court of Appeals's opinion in *Roy* was filed the day after Mr. Rochkind filed his opening brief in this Court.

In *Hazelwood*, the trial court in a lead paint case ruled that the plaintiff's medical causation expert, Eric Sundel, M.D., a pediatrician, was qualified to testify that exposure to lead-based paint can cause a child to lose IQ points and that the plaintiff there had lost between seven and ten IQ points as a result of her exposure to deteriorating lead-based paint at the subject property. On appeal after a verdict in favor of the plaintiff, this Court reversed. We held that Dr. Sundel was not qualified to offer an expert opinion on medical causation because he had no relevant experience treating children for lead exposure; had never before testified as an expert in a lead paint poisoning case; and had no experience evaluating brain impairment in children who have been exposed to lead. We concluded that the court abused its discretion, under Rule 5-702(1), by allowing Dr. Sundel to "testify as to [the plaintiff]'s IQ or the loss of IQ points resulting from lead exposure or any alleged 'brain impairment.'" *Id.* at 686. We also found Dr. Sundel's testimony that the plaintiff had lost seven to ten IQ points due to lead paint exposure to be "no more than speculation based on articles he read that correlated diminished IQ with lead exposure." *Id.* at 689-90.

In *Roy v. Dackman*, one of the issues before the Court of Appeals was whether the circuit court had abused its discretion by precluding a pediatrician—in fact, Dr. Sundel, the same pediatrician as in *Hazelwood*—from testifying about medical causation, in particular, loss of IQ points resulting from childhood exposure to lead. The Court held that although Dr. Sundel might "not be the most qualified expert witness" on that subject, he was "competent . . . to testify" about it. 445 Md. at 43. The Court noted that there were "material differences" between the record in *Hazelwood* and the record in the case

47

before it with respect to Dr. Sundel's qualifications. *Id*. at 49. It characterized as "overly demanding" this Court's holding in *Hazelwood* that Dr. Sundel was not qualified because he "lacked 'specialized knowledge concerning childhood lead poisoning, and specifically, the determination of the source of a child's lead exposure and causation.'" *Id*. The Court emphasized, moreover, that since *Hazelwood*, Dr. Sundel had "endeavored to be more specific and shore-up the supposed deficiencies in his qualifications," by reviewing and keeping up to date on publications about lead paint poisoning in children; and he had relied on the Lanphear Study, which is a well-known, although controversial, epidemiological study concerning IQ loss and childhood lead poisoning. *Id*. at 50. The Court concluded that the circuit court had abused its discretion by excluding Dr. Sundel's medical causation opinion:

> Dr. Sundel's academic and experiential qualifications include a three year pediatric residency in New York, a two year pediatric fellowship at Johns Hopkins University Hospital, and more than 20 years in practice. With this experience and as a board-certified pediatrician, Dr. Sundel was shown on this record to possess a sufficient background from which to provide an opinion as to the injuries claimed to have been suffered by [the plaintiff] as the result of alleged exposure to lead. Whether a jury will find his testimony persuasive will depend, in large measure, on the effectiveness of [defendants]' cross-examination and a comparison/weighing by the jury against [defendants]' competing witness(es)' testimony.

*Id*. at 52.

It is clear from *Roy* that a pediatrician need not have specialized knowledge in the area of IQ test administration and interpretation to render a medical causation opinion that exposure to lead-based paint resulted in a loss of IQ points. It also is clear from *Roy* that this dispute did not trigger the need for a *Frye-Reed* hearing. 445 Md. at 33 n.9

48

(stating with respect to defense counsel's argument that Dr. Sundel's IQ loss opinion was "sheer speculation" that "[i]t is clear from the extensive medical/scientific research on the effects of lead paint exposure on children that expert opinions relating to this topic do not trigger generally the need for a *Frye/Reed* hearing and analysis").

Because, as Mr. Rochkind acknowledges, there is a scientific consensus that lead poisoning causes IQ loss, the only issue is whether the trial court abused its discretion by allowing Dr. Hall-Carrington to opine that Ms. Stevenson sustained a specific IQ loss of between five and six points. Dr. Hall-Carrington formed her opinion by extrapolating from epidemiological studies quantifying IQ loss resulting from lead exposure in the general population to estimate the range of IQ loss in an individual. The court accepted this methodology as sound. This was not an abuse of discretion. Dr. Hall-Carrington's opinion that lead exposure was a substantial factor in causing the loss of a specific number of IQ points was not novel. *See, e.g., N.B.S., Inc. v. Harvey*, 121 Md. App. 334, 337 (1998) (noting that the evidence at trial, viewed in a light most favorable to the plaintiffs, showed that they lost ten IQ points and five IQ points respectively as a result of their exposure to lead); *Berg v. Byrd*, 124 Md. App. 208, 212 (1998) (noting that the plaintiff's expert opined that he lost between five to ten IQ points as a result of his exposure to lead).

On vigorous cross-examination, Dr. Hall-Carrington fully explained the basis for her calculation of the IQ loss. Although her reasons for using Ms. Stevenson's peak blood level were vague, she explained that the range of IQ loss would not have differed had she used Ms. Stevenson's average level. Mr. Rochkind's experts also opined to a

range of IQ loss—albeit a smaller range—based upon Ms. Stevenson's blood lead levels. Unlike Dr. Sundel's vague and variable IQ loss opinion in *Hazelwood*, Dr. Hall-Carrington's IQ loss opinion was supported by an adequate factual basis.

### III.

### Mark Lieberman

Mr. Rochkind contends the trial court erred by permitting Mr. Lieberman, a certified rehabilitation counselor, to opine that, but for Ms. Stevenson's cognitive deficits, she would have functioned in the marketplace as an "average high school graduate." He complains that Mr. Lieberman was not qualified to offer that opinion and his methodology was unsound. Specifically, Mr. Rochkind argues that Mr. Lieberman assumed, improperly, that all the impairments identified in Dr. Kraft's report were caused by lead exposure when Dr. Kraft did not make that determination.

Ms. Stevenson responds that Dr. Hall-Carrington's testimony established that the neuropsychological deficits Dr. Kraft identified were caused by exposure to lead-based paint and that Mr. Lieberman properly relied upon that testimony as the basis for his vocational opinion.

Mr. Lieberman's testimony concerned vocational marketability. He was asked to review Ms. Stevenson's file after the sudden death of Martin Klitzner, a vocational counselor who had met with Ms. Stevenson in January of 2013. He reviewed all of Ms. Stevenson's records and Mr. Klitzner's report and also met with Ms. Stevenson in the interim between the First and Second Trials. He assessed Ms. Stevenson's employment

capacity using the RAPEL method (Rehabilitation plan; Access to the labor market; Placeability; Earning capacity; and Labor force participation).

Mr. Lieberman opined that Ms. Stevenson was functionally illiterate, had ADHD, and would require a high level of supervision and direction in the workplace. She had failed the entrance examinations for Baltimore City Community College and had been advised to take pre-remedial continuing education classes to try to improve her academic abilities. Mr. Lieberman further opined that Ms. Stevenson's low IQ, ADHD, and functional illiteracy all were deficits that would adversely affect her vocational placement. As a result of these deficits, Ms. Stevenson only would be able to find employment in "very low skill positions requiring limited independent decision making, limited ability to read and remember information and require a high level of supervision." These are "unskilled manual labor" jobs that pay "at or near minimum wage." He testified that she would likely only be able to work part-time. In addition, in order to maintain employment, she would require the services of a job coach for "a couple hours a week." According to Mr. Lieberman, a job coach typically charges about $38 an hour.

Mr. Lieberman opined that, but for her IQ loss of five to six points, Ms. Stevenson's vocational abilities would have been within the "average range." He opined that under the PEEDS-RAPEL method,[15] vocational counselors focus on parental and family history in assessing the vocational prospects of the child. Ms. Stevenson's mother

---

[15] PEEDS is an acronym for: Parental/family occupations; Educational attainment; Evaluation results; Developmental stage; Synthesis.

(Ms. Montgomery) had graduated from high school; had been employed as an EMT; had obtained her CDL license; had worked as a correctional officer; and was a certified phlebotomist. Ms. Stevenson's father had earned his GED; had managed a Kentucky Fried Chicken franchise; and had obtained his CDL license as well. Mr. Lieberman opined that he would expect Ms. Stevenson to perform as well or better vocationally than her parents, but, in light of her cognitive deficits, that was not possible. His ultimate opinion was that Ms. Stevenson would be limited to obtaining "basic jobs" earning the minimum wage (then $7.25/hour), for an annual salary of around $15,000.

The trial court did not abuse its discretion by admitting Mr. Lieberman's expert testimony about Ms. Stevenson's vocational prospects with and without her cognitive deficits. Mr. Lieberman's expertise was in the area of vocational rehabilitation. He was not asked to opine, nor did he opine, about the etiology of Ms. Stevenson's cognitive impairment. That issue was the subject of Dr. Hall-Carrington's testimony. Mr. Lieberman's opinions that with her cognitive deficits Ms. Stevenson would only be able to attain part-time, minimum wage employment and that, but for these deficits, she could have achieved greater earnings typical of an average high-school graduate were adequately supported by facts in evidence and were not based on speculation or conjecture. *See Lewin Realty III, Inc. v. Brooks*, 138 Md. App. 244 (2001), *abrogated on other grounds by Ruffin Hotel Corp. of Md., Inc. v. Gasper*, 418 Md. 594 (2011).

## IV.

## Dr. Conte

In a related contention, Mr. Rochkind argues that Dr. Conte's opinion at the Second Trial should have been excluded because it was premised upon Mr. Lieberman's opinion, which was deficient. Because the trial court did not abuse its discretion in admitting Mr. Lieberman's opinion testimony, it did not abuse its discretion in admitting Dr. Conte's opinion because it was based on Mr. Lieberman's opinion testimony.

## V.

## Dr. Brookshire

On direct examination, Dr. Brookshire, who, as mentioned, was Mr. Rochkind's economics expert, testified that Ms. Stevenson had "not sustained any loss of earning capacity or work-life expectancy due to claimed exposure to lead." He then was asked about his familiarity with "a series of studies by medical economists on the effect of lead on lifetime earning capacity." He identified three studies on that topic, one of which quantifies "loss of lifetime earnings related to micrograms per deciliter of blood lead exposure that an individual might have." When he was asked to explain how he had used those figures and "updated it using appropriate economic means for present value," Ms. Stevenson objected.

At the bench, Ms. Stevenson's counsel argued that because Dr. Brookshire's opinion was that Ms. Stevenson had not sustained any loss of earnings whatsoever due to her lead exposure, he could not have relied on the studies quantifying the loss of earnings based on blood lead levels in formulating his opinion. Moreover, he had not disclosed

53

any opinion based upon these studies before trial. Counsel for Mr. Rochkind proffered that Dr. Brookshire would testify that, based upon her blood lead levels, Ms. Stevenson's loss of earnings caused by lead exposure would not exceed $8,000.

The court agreed with Ms. Stevenson, ruling that because Dr. Brookshire had not relied on the studies in question in formulating his expert opinion and because Dr. Conte also had not relied on them, the data from the studies would not be helpful to the jury and was not admissible under Rule 5-703(b).

Mr. Rochkind contends this ruling was an abuse of discretion. He maintains that the studies were relevant to show that Dr. Brookshire's "damages estimate was consistent with the existing scientific literature" and, "[m]ore importantly, [they] w[ere] offered to refute Dr. Conte's opinion." Ms. Stevenson responds that the court acted within its discretion to preclude Dr. Brookshire from giving an opinion at trial that was not disclosed in discovery and was not consistent with his disclosed opinion that Ms. Stevenson had not suffered any economic loss.

Rule 5-703, entitled "Bases of opinion testimony by experts," states:

(a) In general. The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

(b) Disclosure to jury. If determined to be trustworthy, necessary to illuminate testimony, and unprivileged, facts or data reasonably relied upon by an expert pursuant to section (a) may, in the discretion of the court, be disclosed to the jury even if those facts and data are not admissible in evidence. Upon request, the court shall instruct the jury to use those facts and data only for the purpose of evaluating the validity and probative value of the expert's opinion or inference.

54

(c) Right to challenge expert. This Rule does not limit the right of an opposing party to cross-examine an expert witness or to test the basis of the expert's opinion or inference.

The "facts or data" at issue were not "reasonably relied upon" by Dr. Brookshire in forming his expert opinion that Ms. Stevenson did not sustain any economic loss as a result of her exposure to lead. While it may have been appropriate to cross-examine Dr. Conte about these studies, the court did not abuse its discretion in ruling that the underlying calculations were not admissible in evidence by Mr. Rochkind through Dr. Brookshire.

## VI.

### Collateral Source Evidence

During Mr. Lieberman's testimony, Ms. Stevenson's records from the DORS program were admitted into evidence. Certain of those records included boiler-plate language stating that DORS clients who are eligible for SSI or SSDI benefits are "excluded from participation in cost of services," meaning that the services they receive through DORS are free. As mentioned, Ms. Crowder, from DORS, testified that this would include the cost of post-employment job-coaching to the extent a client qualifies for that service.

Defense counsel sought to question Dr. Conte about the DORS records to determine whether, in reaching his economic loss opinion, he had considered the possibility of Ms. Stevenson's receiving free job coaching through DORS. As discussed, Dr. Conte had opined that Ms. Stevenson's entire future earnings would be offset by the

cost of a permanent job coach. The court heard argument and ruled that the collateral source rule precluded any reference to the cost of DORS services.

Mr. Rochkind contends this was error. He argues that, even if the collateral source doctrine applied, once Ms. Stevenson moved the DORS records into evidence without any restriction on their use, he was free to use them to cross-examine Ms. Stevenson's witnesses. Ms. Stevenson responds that the court properly limited cross-examination to prevent evidence about payment of services by an entity or individual other than the alleged tortfeasor.

Maryland adheres to the rule that "an injured person [may] recover in tort the full amount of his provable damages regardless of the amount of compensation which the person has received for his injuries from sources unrelated to the tortfeasor." *Motor Vehicle Admin. v. Seidel Chevrolet, Inc.*, 326 Md. 237, 253 (1992). Free job coaching services from DORS are collateral source payments that are not admissible to offset damages. Ms. Stevenson's introduction into evidence of all the DORS documents, including those reflecting a policy not to charge clients for services if they are eligible for SSI or SSDI benefits, did not operate to waive the collateral source rule. The court did not abuse its discretion by precluding defense counsel from asking Dr. Conte if he had factored this collateral source into his economic loss opinion.

## CROSS-APPEAL

### Attorneys' Fees

The CPA "specifically prohibits any person from engaging in unfair and deceptive procedures in the rental or offer for rental of consumer realty." *Golt v. Phillips*, 308 Md.

1, 8 (1986). It is an unfair or deceptive trade practice for a landlord to lease property that is not fit for habitation, including property that contains deteriorated lead-based paint. *See Butler v. S & S P'Ship*, 435 Md. 635, 667-68 (2013). The deteriorated paint must be present "at the inception of a lease for the hazard to qualify as a basis for a CPA violation." *Id*. at 668; *see also Richwind Joint Venture 4 v. Brunson*, 335 Md. 661, 685 (1994) ("It is reasonable to assume that the General Assembly intended to limit application of the CPA to material misstatements and omissions at the inception of the lease rather than during the full term of the lease.").

The CPA authorizes an individual to bring a private cause of action "to recover for injury or loss sustained by him as the result of a practice prohibited by this title." CL § 13-408(a). "Any person who brings an action to recover for injury or loss under [the CPA] and who is awarded damages may also seek, and the court may award, reasonable attorney's fees." CL § 13-408(b). As this language makes clear, the decision to award fees under the CPA is discretionary.

In this case, Ms. Stevenson's complaint set forth claims for negligence and for unfair or deceptive trade practices under the CPA. In the First Trial, the jurors were asked whether they found "that [the Fairview Property] contained chipping, flaking, or peeling paint at the beginning of the tenancy?" They answered that question in the affirmative. Thus, the jurors found as a fact that Mr. Rochkind had committed an unfair or deceptive trade practice by renting the Fairview Property to Ms. Stevenson in a condition that was not fit for habitation.

57

On December 10, 2014, following the Second Trial, Ms. Stevenson filed a petition for prevailing party attorneys' fees under CL section 13-408(b). She attached a copy of her retainer agreement with her attorneys, in which she promised to pay them a contingency fee equal to forty percent of any sum recovered, plus expenses. She also attached a "Client Expense Itemization" listing expenses totaling $135,513.81. She asked the court to award her the full contingency fee ($437,200) and all expenses, for a total of $572,713.81.

Alternatively, Ms. Stevenson asked the court to grant her an award of attorneys' fees using the lodestar approach. She attached a "Time Chart" detailing work performed on her case by Scott Nevin, the lead attorney, and by Robert Leonard, an associate. She did not include time billed by paralegals and law clerks. In an attached affidavit, Mr. Nevin attested that when Ms. Stevenson retained him he had been licensed as an attorney in Maryland for nearly 30 years, half of which he had spent specializing in lead paint poisoning cases. Mr. Leonard had been licensed in Maryland for seven years. The time chart calculated hours in two time frames: the period from December 19, 2011, through March 17, 2014, and the period from March 17, 2014, through November of 2014. The chart reflected that Mr. Nevin worked on the case for 116.5 hours in the first period and an additional 62.75 hours thereafter; and that Mr. Leonard worked 221.25 hours in the first period and an additional 105.5 hours thereafter. Although the Mr. Nevin's affidavit did not explain why the hours were broken into these two periods, it is clear that the first

period covers all litigation in the First Trial and the second period covers all litigation in the Second Trial.[16]

Ms. Stevenson also attached to her petition the "Laffey Matrix" for 2014-2015. The Laffey Matrix, which is prepared by the Civil Division of the United States Attorney's Office for the District of Columbia, suggests appropriate hourly rates for attorneys based upon years of experience. The Laffey Matrix for 2014-2015 suggested an hourly rate of $520 per hour for attorneys with more than twenty years' experience and an hourly rate of $300 per hour for attorneys with between 4-7 years' experience. Ms. Stevenson argued, based on the Laffey Matrix, that a reasonable hourly rate for Mr. Nevin was $700 per hour for the first period and $725 per hour for the second period; and a reasonable hourly rate for Mr. Leonard was $400 per hour for the first period and $425 per hour for the second period. Using these rates, she asked the court to award her $260,381.25 in fees plus the $135,513.81 in expenses, for a total of $395,895.06.

Mr. Rochkind filed an opposition to the fee petition. As relevant here, he argued that the fee-shifting provision of the CPA is not intended to apply to personal injury actions that are alternatively styled as unfair trade practice actions; that Ms. Stevenson is not permitted to recover her contingency fee or expenses under the CPA; and that Ms.

---

[16] The verdict in the First Trial was returned on March 18, 2014.

59

Stevenson failed to provide "sufficient information so that [the circuit court] might conduct the analysis it is required to conduct under Maryland law." [17]

On January 30, 2015, the court heard argument on the petition and, on March 18, 2015, it entered an order denying it. The court set out the guidelines for awarding attorneys' fees under the CPA. It explained that the first step is to engage in a lodestar analysis by "'multiplying "the number of hours reasonably expended on the litigation . . . by a reasonable hourly rate"'" to "'arrive at a "useful starting point."'" (Quoting *Friolo v. Frankel*, 403 Md. 443, 453-54 (2008) ("*Friolo II*"), in turn quoting *Friolo v. Frankel*, 373 Md. 501, 523 (2003) ("*Friolo I*")). The second step is to subtract "excessive, redundant, or otherwise unnecessary" hours or hours "not properly billed to one's client." *Friolo II* at 453-54. The second step involves consideration of the factors enumerated in Rule 1.5 of the Maryland Lawyers' Rules of Professional Conduct ("MLRPC") governing fees charged.[18]

The court found that, in light of the jury's answer to the first question on the special verdict sheet at the First Trial, Ms. Stevenson was a prevailing party on her CPA

---

[17] In his opposition and in his motion for new trial, Mr. Rochkind argued that the CPA claim should not have been submitted to the jury at the First Trial because Ms. Montgomery testified that the property was freshly painted at the inception of the tenancy. He does not advance that argument on appeal.

[18] Those factors include "the time and labor required," "the novelty and difficulty of the questions involved," and the "likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer," and "the experience, reputation, and ability of the lawyer or lawyers performing the services." Md. Rule 16-812, MLRPC 1.5.

claim. It also found that "[h]er claims of negligence and violation of the CPA, which yielded successful jury verdicts in both trials, arose from 'a common core of facts' and 'related legal theories.'" (Quoting *Friolo I*, at 524). In the court's view, the "causes of action [negligence and the CPA violation] essentially were indivisible in the presentation of operative facts during the [F]irst [T]rial" and "there was no differentiation between the two causes of action in terms of proof and determination of damages" in the Second Trial. The court also determined that only attorneys' fees, not expenses or fees attributable to non-attorneys, may be awarded under the CPA.

Turning to whether a fee award was appropriate, the court found that the "Time Chart" and the Nevin Affidavit were too vague for it to apply the lodestar method. The Time Chart did not "state the actual time or describe the tasks undertaken to investigate [Ms. Stevenson's] claims, communicate with the client and witnesses, draft pleadings, review other parties' pleadings, prepare interrogatories, request document production, prepare for depositions, engage in motions practice, attend court hearings for particular purposes, or address alternative dispute resolution."

The court also took issue with Ms. Stevenson's use of the "Laffey Matrix," noting that it is "a mechanism for calculating reasonable attorney's fees in Washington, D.C.," not in Baltimore. The court observed that the hourly rates listed in Appendix B to the Local Rules of the United States District Court for the District of Maryland are "more apt

and comparable."[19]   Finally, the court concluded that it could not assess the reasonableness of the fee request because the Nevin Affidavit did not address "whether and how he was prevented from taking on any new cases by the inconvenience of conducting the two trials in this case."

For all these reasons, the court determined that Ms. Stevenson had not "provide[d] sufficient information to allow th[e] court to make the reasoned and well supported analysis required" for an award of fees; nor did the docket entries provide "specific information as to what an appropriate fee might be."  The Nevin Affidavit and the Time Chart "offer[ed] some information as to some of the enumerated factors" but failed "to offer sufficient detail to satisfy many of the remaining criteria."  Due to the lack of information, the court found itself unable to "inject some reasonableness into fees sought by [Ms. Stevenson's] counsel."  It thus denied the petition for fees.

Within ten-days of the entry of that order, Ms. Stevenson moved for reconsideration.  She argued that the court abused its discretion by denying the fee petition because it did not exercise any discretion in doing so.  She emphasized that the court had discretion to assess the reasonableness of the hourly rates and to lower the rates requested, such as by applying rates consistent with Appendix B.  She maintained that

---

[19] Section 3 of Appendix B sets forth "Guidelines Regarding Hourly Rates."  For the period between July 1, 2011 and June 30, 2014, the guideline rate for lawyers admitted to the bar for between five to eight years was $165-250 per hour and for lawyers admitted to the bar for 15 years or more was $275-400 per hour.  Effective July 1, 2014, the lower range was amended to between $165-300 per hour and a new guideline range was added for lawyers admitted to the bar for 20 years or more of $300-475 per hour.

Mr. Leonard and Mr. Nevin were entitled to the hourly rate at the high end of the ranges provided in Appendix B ($300 per hour for Mr. Leonard and $475 per hour for Mr. Nevin). She maintained that the court failed to exercise its discretion when it did not even calculate a lodestar figure and assess the reasonableness of the fees sought under that methodology.

By order entered on June 8, 2015, the court denied the motion for reconsideration. It noted that Ms. Stevenson did not take issue with the court's legal analysis, but with the application of the law to the facts. It reiterated that the Time Chart failed to distinguish between time spent on the CPA claim and time spent on the negligence claim. It concluded that, "[w]ithout evidence sufficiently detailing the time [Ms. Stevenson]'s attorneys spent on the entire case, let alone the CPA claim," the court "would be engaging in speculation for the 'number of hours reasonably expended' portion of the reasonable fee analysis." Thus, even if the court had been able to determine a reasonable hourly rate, it was unable, with the information furnished, to "engage in the case-specific, detail-oriented, and thorough analysis required in order to grant an award of attorneys' fees."

On appeal, Ms. Stevenson contends the circuit court abused its discretion by not awarding her any attorneys' fees under the CPA. She maintains that the court failed to exercise any discretion to "determine a reasonable hourly rate based on [its] own knowledge and experience," coupled with the Laffey Matrix and Appendix B. And, having found that the CPA claim and the negligence claim were "essentially . . .

indivisible," the court abused its discretion by not awarding her attorneys' fees for "all of the time that counsel spent on the litigation."

Mr. Rochkind responds that the court properly exercised its discretion to deny the fee petition because Ms. Stevenson failed to present adequate proof of the appropriate hourly rate and the number of hours reasonably expended on her CPA claim. With respect to the hourly rate, he maintains that Ms. Stevenson had to "provide specific evidence, such as expert testimony or affidavits demonstrating that attorneys with similar qualifications have received in the past the same fees for similar work conducted in the same jurisdiction." This was especially so given that her counsel had not provided any explanation for how they had arrived at the requested hourly rates, which far exceeded the amounts shown on the Laffey Matrix. With respect to the hours reasonably expended, Mr. Rochkind asserts that the Time Chart was "entirely inadequate," both because it lacked sufficient detail and because it failed to "segregate the time spent on the CPA claim from the time spent on other claims." Alternatively, he argues that an award of fees is not appropriate in a case of this type because it is a personal injury action and because it is impossible to divine from the verdict in the First Trial whether the jury awarded damages for violation of the CPA or on the negligence claim.

In *Richwind,* 335 Md. at 687, the Court of Appeals expressed doubt that an award of attorneys' fees under section 13-408(b) of the CPA would be appropriate in a case like the one at bar:

> The instant case is fundamentally a personal injury action. It is questionable whether the legislature intended to abrogate the long-standing rule that attorney fees are not recoverable in personal injury actions, and to

64

permit plaintiffs who recover tort damages for personal injuries also to recover attorney fees in such actions by bringing them under the CPA. Based on our holding that the CPA is not applicable, we need not reach the issue of whether attorney's fees could properly be awarded in a personal injury tort action based on an additional count which alleges the tort was also a violation of the CPA.

Like in *Richwind*, in this case, Ms. Stevenson prosecuted a quintessential personal injury action, but alleged that "the tort was also a violation of the CPA." We need not decide whether an award of prevailing party fees ever would be appropriate in such an action, however, because we conclude that the trial court did not abuse its discretion by denying the petition in any event.

Putting aside that Ms. Stevenson requested an award of her total contingency fee and an award of expenses, both of which are plainly prohibited, she asked, in the alternative, for the court to use the lodestar method and apply hourly rates that were not supported by any evidence. The beginning rate proposed for Mr. Nevin was $700 per hour, $180 per hour more than the rate in the Laffey Matrix and $225 per hour more than the high end of the range in Appendix B for an attorney with his experience. The beginning rate proposed for Mr. Leonard—$400 per hour—exceeded the Laffey Matrix rate and the high end of the Appendix B rate by $100 per hour. Ms. Stevenson did not present any evidence to justify the use of the Laffey Matrix for a case tried in Baltimore City or to justify an upward departure from those rates. In her motion for reconsideration, she argued that the court should have applied Appendix B, but did not

offer any explanation as to why her counsel were entitled to fees at the high end of the applicable ranges.[20]

And most significantly, Ms. Stevenson did not provide evidence from which the court could determine the number of attorney hours reasonably expended on Ms. Stevenson's CPA claim. The Time Chart lacks the detail to do so. For example, as mentioned, Ms. Stevenson originally sued four other defendants. The Time Chart does not specify and segregate hours spent investigating the claims against those defendants. Ms. Stevenson's proof that there was deteriorated lead-based paint at the inception of her tenancy at the Fairview Property—all that was needed to establish the CPA violation— was Ms. Montgomery's and White's testimony to that effect. Had the jurors found against her on that issue, it would not have been fatal to her remaining negligence claim, which was premised on Mr. Rochkind's being on notice of the existence of deteriorated lead-based paint *at any time* during her tenancy. As Judge White found, however, Ms. Stevenson made no attempt to separate out the hours spent developing and presenting evidence on the discrete CPA claim from the hours spent on the bulk of this personal injury negligence action. Given the dearth of evidence that would allow the court to assess the reasonableness of the attorney hours spent in prosecuting the CPA claim, the court did not abuse its discretion in denying the fee petition.

---

[20] Ms. Stevenson also did not explain why the hourly rates for Mr. Leonard and Mr. Nevin during the period between December 2011 and June 2014 should not have been calculated under Appendix B to the then applicable Local Rules, which would have reduced the high end amount for Mr. Leonard from $300 to $250 and the high end amount for Mr. Nevin from $475 to $400.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID ONE-HALF BY THE APPELLANT/CROSS-APPELLEE AND ONE-HALF BY THE APPELLEE/CROSS-APPELLANT.**